IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

THERESA F. NILES,

      Plaintiff,

vs.                                                                Case No. 04-4060-SAC

AMERICAN AIRLINES, INC.,
TRANSWORLD AIRLINES, LLC
UNIVERSAL WELFARE BENEFIT PLAN,
METROPOLITAN LIFE INSURANCE COMPANY, INC.,

        Defendants.

MEMORANDUM AND ORDER

     This case comes before the court on the Tenth Circuit's remand of

plaintiff's ERISA claim for disability benefits. The court adopts all

statements of facts, analysis and rulings set forth in its prior order to the

extent not reversed by the Tenth Circuit.

**Exhibits**

     The Tenth Circuit affirmed this court's evidentiary rulings with the

exception of this court's striking of plaintiff's exhibits 3 through 5 and 10,

which it asked this court is to reconsider. Exhibit 10 is an affidavit by Ms.

Sharon Grams, the custodian of records at Ransom Memorial Hospital

where plaintiff's FCE was conducted, with over 280 pages of records attached. It was offered to authenticate over 300 pages of medical records, including exhibits 3 through 5, which are allegedly earlier drafts of the FCE report, containing handwritten notations and a fax cover sheet. Plaintiff contends that exhibits 3 through 5 show that defendant Met Life used undue influence to effect a change in the FCE's conclusions.

The Tenth Circuit noted that this court did not address plaintiff's appellate arguments that she intends to use exhibit 10 solely for impeachment purposes, and that her failure to disclose it was harmless. (Dk. 109, p. 21).  The Tenth Circuit then instructed:

> Because these exhibits may be crucial to Ms. Niles' case if they invalidate the FCE, we instruct the district court on remand to consider whether the exhibits should be received notwithstanding the lack of timely disclosure of exhibit 10 and the consequent lack of authentication for exhibits 3 through 5, either because they are going to be used solely for impeachment purposes, or because the lack of disclosure is harmless.

Dk. 109, p. 21.

This court did not address either plaintiff's impeachment argument or the harmless error argument because plaintiff did not make either argument to this court. Despite her filing of multiple briefs concerning the admissibility of exhibit 10 in response to defendant's' motions to strike it

and other exhibits, *see* Dk. 77, 78, 85, 86, 87, 88, 92, 93 96, 97, plaintiff neither mentioned any intent to use exhibit 10 for impeachment, nor contended that her failure to disclose it was harmless. Instead, she repeatedly argued to this court that exhibit 10 was "for no other purpose" than to authenticate exhibits 2 through 5 (Dk. 92, p. 2), that it was "solely" to certify other documents (Dk. 93, p. 6), that it was to authenticate exhibits 3 through 5 "and for that purpose only," (Dk. 92, p. 6), and was offered "solely" to authenticate other exhibits (Dk. 92, p. 7).

Apparently, either the plaintiff misled the Tenth Circuit into believing that these issues had been raised below, or the Tenth Circuit chose to disregard its traditional approach of refusing to consider for the first time on appeal issues not presented to the district court, *see Miller v. Pfizer, Inc.*, 356 F.3d 1326, 1335 -1336 (10th Cir. 2004), as well as its traditional review of evidentiary rulings for abuse of discretion, *see Roe ex rel. Roe v. Keady*, 329 F.3d 1188, 1194 (10th Cir. 2003). *See Boldridge v. Tyson Foods*, No. 07-3161 (10th Cir. May 30, 2008) (affirming, under abuse of discretion standard, district court's exclusion of exhibits which were not authenticated, and refusing to consider new evidence on appeal).

In either event, this court is willing to conduct the legal analysis the

3

Tenth Circuit has required of it, but has little factual or legal basis in the record upon which to do so. This court is not required to research and construct a legal argument to support plaintiffs' evidentiary objections on appeal which the plaintiff chose not to make to the district court. Nonetheless, the court scours the record for arguments that may be made to fit the mold.

Fed.R.Civ.P. 26(a)(1)(B) requires disclosure of documents in one's possession which may be used to support a claim, unless "solely for impeachment." The court first examines whether plaintiff has shown that exhibit 10 is to be used "solely for impeachment," as she claimed to the Tenth Circuit. Plaintiff argued to this court that exhibit 10, in conjunction with exhibits 3 through 5,

> establish[] that MetLife breached its fiduciary duties to plaintiff through their improper involvement with an FCE which must be "independent." They also show that MetLife's claim file is incomplete.

Dk. 78, p. 14. Plaintiff thus sought admission of the documents to make an affirmative showing of an essential element of her claim that defendants breached their fiduciary duty, not "solely for impeachment." Fed.R.Civ.P. 26(a)(1)(B).  Plaintiff argued that MetLife's breach of fiduciary duty was established not only by defendant's own claim file and admissions, but also

4

by plaintiff's exhibits, *i.e.*, exhs. 3-5 and 10. *See also* Dk. 78, p.16.

Although plaintiff may have secretly intended to also use these exhibits

only if necessary for impeachment, that intent was never conveyed to this

court, and her assertions in her briefs do not meet the exclusive

impeachment requirement of Fed.R.Civ.P. 26(a)(1)(B). Accordingly, as this

court previously found, plaintiff has violated Rule 26(a)(1)(B) and/or

26(e)(1) (regarding supplementation of disclosures) by failing to disclose

documents in her possession which may be used to support a claim.

The court thus examines the sanction of Rule 37(c)(1), which

provides:

> A party that without substantial justification fails to disclose
> information required by Rule 26(a) or 26(e)(1) is not, unless such
> failure is harmless, permitted to use as evidence at a trial, at a
> hearing, or on a motion any witness or information not so disclosed.

The non-moving party has the burden of showing that he was substantially

justified in failing to comply with Rule 26(a)(1). *Nguyen v. IBP, Inc.*,162

F.R.D. 675, 680 (D.Kan.1995). Here, that burden falls on the plaintiff.

In determining whether a Rule 26(a) violation is justified or harmless,

the court exercises its discretion, guided by certain factors.

> "The determination of whether a Rule 26(a) violation is justified
> or harmless is entrusted to the broad discretion of the district court."
> *Mid-America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353,

5

> 1363 (7th Cir.1996). A district court need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose. *United States v. $9,041,598.68*, 163 F.3d 238, 252 (5th Cir.1998). Nevertheless, the following factors should guide its discretion: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness.

*Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.,* 170 F.3d 985, 993 (10th Cir.1999).

The closest plaintiff comes to contending that her non-disclosure was justified is in claiming that defendants, in the exercise of their fiduciary duty, should have obtained the same documents themselves and made them part of plaintiff's claim file. (Dk. 93, p.12). Plaintiff does not cite any authority for her contention that the exercise of fiduciary duty compels defendants to obtain the challenged documents. Further, "Rule 26(a)(1) does not permit a party to avoid its mandatory discovery obligations by arguing that the other side could have relied on its own resources to obtain the same information." *Lobato v. Ford*, 2007 WL 2593485, 6 (D.Colo. 2007) (rejecting a contention that disclosure was adequate if the court took into consideration what "the other parties or their lawyers knew or should have known.")

Plaintiff does not offer any reason why she did not disclose the exhibits to defendants when she first received them. The court's review of the record shows that the hospital sent exhibit 10 and its attachments to plaintiff's counsel on October 27, 2005, but that plaintiff's counsel did not disclose the existence of the documents until she attached them to her reply brief, filed February 28, 2006. Attaching new exhibits to a reply brief is, itself, a "troubling" practice. *See United States v. Soussi*, 316 F.3d 1095, 1108 n. 9 (10th Cir. 2002) (so stating), *cert. denied*, 538 U.S. 971 (2003); *Kansas Waste Water, Inc. v. Alliant Techsystems, Inc.*, 2005 WL 327144, 1(D.Kan. 2005) (striking exhibits attached to reply brief). "Courts in this district generally refuse to consider issues raised for the first time a reply brief." *Liebau v. Columbia Casualty Co.*,176 F.Supp.2d 1236, 1244 (D.Kan. 2001). *See Mike v. Dymon, Inc.,* No. 95-2405-EEO, 1996 WL 427761, at *2 (D.Kan. July 25, 1996) ("In pursuit of fairness and proper notice, the court generally summarily denies or excludes all arguments and issues first raised in reply briefs.")

The record additionally reflects that after plaintiff's counsel was sent exhibit 10, she took time to move the court for two extensions of time in which to file her reply brief, but did not notify defendants of her receipt of

7

the voluminous documents. *See* Exh.10, p.1; Dk. 63, 73, 76, 77. In support of her motions for extensions of time in which to reply, she cited the "volume and complexity" of other cases, instead of her need to review over 280 pages of documents she had received from the hospital (exhibit 10) in this case, and intended to attach to her reply. Dk. 63, 73. These circumstances suggest that plaintiff's failure to disclose the existence of the documents may have been due to strategic planning rather than to mere oversight. But even if the delay in disclosure was due to mere oversight, plaintiff has failed to show substantial justification for that failure.

"Failure to comply with the mandate of [Rule 26(a) ] is harmless when there is no prejudice to the party entitled to the disclosure." *Nguyen*, 162 F.R.D. at 680. Plaintiff comes closest to contending that her non-disclosure is harmless by stating that defendants should not be surprised at her undue influence theory since it was included in the pretrial order and in her brief in support of her motion for summary judgment . *See* Dk. 52, p. 53 of 73 (alleging defendants' improper instructions to change the FCE's grid and summary reports). The court's review of the pretrial order shows, among other general theories, one factual contention alleging defendants' improper "involvement" with and reliance upon the FCE, Dk. 93, p. 2, citing

8

the pretrial order at p. 7- 8, 11, but this reference is so vague and non-specific that defendants could reasonably have been surprised when the theory was first explained in plaintiff's reply brief.

Even assuming that the legal theory of undue influence was in the pretrial order and was specific enough to provide fair notice to defendants, the court finds that plaintiff's failure to disclose exhibit 10 is not thereby rendered harmless. Including a factual contention or a legal theory in a pretrial order does not meet the requirement to disclose documents under Rule 26. The Court is concerned that defendants have not had an opportunity to challenge the reliability of the undisclosed records and the notations written on them, and is thereby prejudiced. *See* Fed.R.Civ.P. 26. As the Tenth Circuit noted, "Defendants were deprived by the lack of disclosure of an opportunity to depose Ms. Gram concerning any knowledge she might have of the history and provenance of the FCE documents and the handwritten notations on them." Dk. 109, p. 21. The handwritten notations do not speak for themselves, as they do not reveal who wrote them, when, or why, or which were written at another's direction, as plaintiff contends. Some notations are initials which are susceptible to variable interpretations. Plaintiff suggests the cure of permitting defendants

to depose Ms. Gram now, but the court finds this suggestion to be
impractical as it would substantially disrupt the course of proceedings
without adequate justification.

Under the totality of the circumstances presented here, plaintiff has
not shown that her violation of the rule was either substantially justified or
was harmless. Accordingly, Fed.R.Civ.P. 37(c)(1) requires the imposition of
sanctions. The court thus affirms its finding that exhibit 10 shall be stricken.
As a consequence, exhibits 3-5 lack any foundation for admission and shall
also be disregarded.

Plaintiff additionally contended to the Tenth Circuit that this court
disregarded her deposition corrections, but plaintiff has cited no deposition
corrections to this court, *see* Dk. 49 Exh. 0; Dk. 76, Exh. 5, nor has the
court's independent review of the record revealed any. Plaintiff's only
mention of deposition corrections is to allege that defendants could not cite
to her deposition without also citing to her corrections. Dk. 77.  The court
disagrees with this proposition, as the burden to introduce deposition
corrections into the record on summary judgment rests with the party
seeking to admit them into evidence. In the event plaintiff's deposition
corrections made substantive changes to her testimony, her burden to

10

show they are admissible becomes even greater. *See Burns v. Board of County Com'rs of Jackson County,* 330 F.3d 1275, 1281 (10th Cir. 2003) (deposition changes)*; Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir.1986) (conflicting affidavits).

**Disability benefits claim**

The court's next task, as stated by the Tenth Circuit, is to determine whether the evidence of record creates "a genuine issue of material fact concerning whether Ms. Niles was disabled under the preponderance standard." Dk. 109, p. 14. Having reviewed the admissible evidence de novo, the court finds a genuine issue of material fact concerning whether the nature and extent of plaintiff's pain renders her disabled, as that term is defined in the relevant policy. Construing the facts in the light most favorable to the plaintiff, and fully crediting her subjective complaints of pain, the court finds that plaintiff's statements of disabling pain, as echoed by her treating physician, Dr. Spratt, cut against the lack of objective evidence of disability and create a factual issue precluding summary judgment in favor of any party.

The court's task is thus to "conduct a de novo review of the evidence to determine whether Ms. Niles's benefits claim is supported by a

11

preponderance of the evidence." Dk. 109, p. 13, 22. The Tenth Circuit notes that "the best way for a district court to implement ERISA's purposes in this context is ordinarily to restrict de novo review to the administrative record, "instead of taking new evidence, hearing witnesses, and the like." *Jewell v. Life Ins. Co. of North America,* 508 F.3d 1303, 1308 (10th Cir. 2007), quoting *Hall v. UNUM Life Insurance Co. of America*, 300 F.3d 1197, 1202 (10th Cir. 2002), *cert. denied*, 2008 WL 593761, 76 USLW 3485 (2008). The court's de novo review is "essentially a bench trial on the papers with the district court acting as the finder of fact," since there is no right to a jury trial under ERISA. *See Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003).

Because this case is being reviewed de novo, the burden of proof remains with the plaintiff to prove by a preponderance of the evidence that she is totally disabled within the meaning of the Plan. *See McGee v. Equicor-Equitable HCA Corp.*, 953 F.2d 1192, 1205 (10th Cir.1992) ("It is a basic rule of insurance law that the insured carries the burden of showing a covered loss has occurred."); *Winchester v. Prudential Life Ins. Co. of Am.*, 975 F.2d 1479, 1487-88 (10th Cir.1992) (holding the appellant needed to prove by a preponderance of the evidence that her husband's death fell

12

within the terms of the insurance policy); *Niles v. American Airlines, Inc.*, 2008 WL 711630, 3 (10th Cir. 2008), *citing Alexander v. Winthrop, Stimson, Putnam and Roberts Long Term Disability Coverage,* 497 F.Supp.2d 429, 434 (E.D.N.Y.2007) (finding plaintiff bears the burden of proving her entitlement to benefits. *Compare Fought v. Unum Life Ins. Co. of America*, 379 F.3d 997, 1006 (10th Cir. 2004) (Under ERISA, an insurer bears the burden to prove facts supporting an exclusionary clause, such as a pre-existing injury clause); *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1190 (10th Cir. 2007) (If a plaintiff can prove a serious conflict of interest or the existence of a serious procedural irregularity, then the burden shifts to the plan administrator to prove the reasonableness of its decision under the arbitrary and capricious standard.) To meet her burden in this case, plaintiff must show she is unable to perform the duties of any occupation.

**Plaintiff's evidence**

The court first examines the evidence relied on by plaintiff in support of her claim for disability. Generally, plaintiff contends that reports by Dr. Fishman, Mr. Grunz, Mr. Hildre, Dr. Brothers, the Mayo Clinic, and Dr. Spratt, support disability. She attacks Dr. Petrie's report and the FEC, and

contends that her subjective complaints of pain are credible.

Mr. Grunz, a Licensed Clinical Professional Counselor (LCPC),

served as plaintiff's psychotherapist for 49 sessions beginning in November

of 1998. He completed a medical source statement on May 4, 2003.

Plaintiff points to his check mark in the "poor/none" category for :

> ability to complete a normal workday and workweek without
> interruptions from psychologically based symptoms and perform at a
> consistent pace without an unreasonable number and length of rest
> periods, which requirements are usually strict.

Dk. 52, Exh. 6, AMA 00533. Mr. Grunz marked all thirteen other categories

on the medical source statement "good" or "fair." Plaintiff was initially

diagnosed with generalized anxiety disorder, but Mr. Grunz found a "more

appropriate diagnosis" to be "dysthymic disorder," a depressive disorder,

chronic in origin, "which presents an overall mood depression and

destabilization involving low energy, sleep disturbance, poor concentration,

feeling of a self depreciating nature." *Id.* He noted:

> Many of Ms. Niles activities and capabilities are very limited by
> repetive (sic) occurance (sic) of pain. This impairs her cognitive
> function, attention and any physical motion repetive (sic) in nature.[1]

*Id.* AMA 00533.

---

[1]Mr. Grunz's repeated use of incorrect spelling does little to invite
confidence in his professional opinion.

The court notes that Mr. Grunz is not a physician, and that he made no attempt to assess plaintiff's physical ability to perform a job. As a counselor, he assessed "psychologically based symptoms," but it does not appear that his assessment was based on his independent professional conclusions drawn from his personal observations of plaintiff throughout their sessions. Because no underlying data is referenced, his opinion seems to be based solely on plaintiff's self-reported symptoms. At any rate, his diagnosis does not reflect a major depressive disorder of the type which would typically preclude employment. Nor do his check marks on a form serve as a persuasive opinion in support of total disability. *Cf, Sherman v. Barnhart*, 192 Fed.Appx. 801, 803, 2006 WL 2424791, 2 (10th Cir. 2006) (social security case finding a medical source statement disability form, "standing alone, unaccompanied by thorough written reports or persuasive testimony, not substantial evidence" that one is unable to work) quoting *Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir.1987).

Plaintiff points to a physiatric examination of plaintiff on July 25, 2002, by Ira Fishman, a doctor of osteopathic medicine (D.O.). His diagnostic impressions state:

> This patient has a history of musculoskeletal injuries resulting from a motor vehicle accident which has resulted in cervical arthritis

15

as well as cervical disk herniation with recurrent radicular symptoms. Her examination today was also suggestive of myofascial pain involving her cervical and upper to mid-thoracic paraspinals bilaterally.

Dk. 52, Exh. 6, AMA 00538. Dr. Fishman's functional statement notes:

In consideration of this patient's physical examination completed today and above-mentioned medical history, it is doubtful that she will be able to tolerate work activities involving frequent bending of her neck and back as well as prolonged walking, standing, and sitting. She will also not be able to tolerate frequent lifting with both upper extremities.

*Id.*

The court disagrees with plaintiff's assertion that Dr. Fishman's opinion supports total disability. Although he notes plaintiff may have some myofascial pain, neither the frequency nor the intensity of plaintiff's pain is established, and her pain is not represented to be totally disabling. He projects that plaintiff may not tolerate frequent bending of her neck and back, frequent lifting, or prolonged walking, but these projections fail to establish that plaintiff is unable to engage in any occupation, as the Plan requires for total disability .

Plaintiff additionally submits a written opinion dated August 14, 2003, from Jerold Hildre, a vocational expert (VE) who reviewed various documents. He opines that:

16

> based upon the record as a whole, there has not been medical improvement according to Dr. Spratt nor Mr. Grunz, LCPC and that Ms. Niles is not able to return to her primary job nor perform any other job on a competitive basis.

Dk. 52, Exh. 6, AMA 00560. Mr. Hildre's reliance on the conclusions of Mr. Grunz is too great, for the reasons the court noted above.

Mr. Hildre also states his reliance on the prior determination of disability by Social Security Administration, and his belief that the FCE was unclear and invalid. *Id.*, AMA 00559, 6.The court finds that Mr. Hildre's opinion is less persuasive due to his acceptance of the finding of disability under the Social Security regime, since that determination cannot be equated with the determination of disability under ERISA. Even if the Social Security administration required a showing of plaintiff's inability to work at any occupation, as does this Plan, the method by which that conclusion is reached in Social Security cases is substantially different than that used in ERISA cases. For example, and significant to this case, ERISA does not contain a treating physician rule, *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832,123 S.Ct. 965, 155 L.Ed.2d 1034 (2003), while Social Security does. In an ERISA case, medical information offered by a Plan participant's primary physician is to be considered, but it is not entitled to special deference. *Id.* at 832. *Meraou,* 221 Fed.Appx. at 703*; See Kimber,*

17

196 F.3d at 1099 (holding that a rational plan administrator could reject a treating physician's report of total disability due to diabetes when there was no accompanying clinical data to support the conclusion).

Additionally, Mr. Hildre's reliance on the conclusions of Dr. Spratt is unwarranted. Plaintiff contends that Dr. Spratt, her treating physician, has "consistently stated that [she] is disabled." Dk. 52, p. 62. The record does not support this contention. On the basis of an examination of plaintiff on March 18, 1997, Dr. Spratt diagnosed plaintiff with a "cervical facet fracture" and noted "subjective symptoms" of neck and back pain. He noted that treatment would "substantially improve function and employability," and specified, "Healing is expected with time, then therapy will be indicated." AMA 01036.  On July 17, 1997, Dr. Spratt diagnosed plaintiff's condition as "Fracture C2-3 facet; traumatic arthritis cervical spine; soft tissue injury cervical spine; S1 disc herniation." He noted that her diagnosis was "guarded," but stated, "I believe the patient will gradually improve over time." AMA 00987.  Dr. Spratt's diagnosis of a cervical fracture was not confirmed by subsequent tests and was deemed to be erroneous by other physicians. Nonetheless, these notes show that even when Dr Spratt erroneously believed that plaintiff had a cervical fracture, he believed that plaintiff would gradually and substantially improve with time and treatment.

18

*See also* AMA 00989 (after plaintiff was seen at the Mayo clinic, Dr. Spratt noted her prognosis as "Fair. Anticipate recovery, but convalescence will be prolonged."); AMA 00985 (Dr. Spratt's letter dated September 25, 1997, stated his expectation that plaintiff's disability would "continue until approximately mid-January, 1998. I still feel the patient could resume her previous work duties at some point, but she will have to be in considerably less pain to adequately sustain effective work.")

Later forms completed by Dr. Spratt evidence a change in his prognosis, without explanation. On August 9, 2000, Dr. Spratt diagnosed plaintiff's condition as "arthritic cervical spine, pain in neck, soft tissue injuries cervical spine," noted "subjective symptoms" of chronic neck pain and headaches, and concluded that she could "never" go to work in any occupation.  AMA 00934. *See also* AMA 00474.  A similar form, dated March 7, 2002, concludes that plaintiff was "permanently disabled" from her own job and from any other work. AMA 00476. Because these are merely forms, and do not state the basis for Dr. Spratt's conclusions or for his changed prognosis, the court finds them to be of little weight.

More recent is Dr. Spratt's opinion of the FCE, which he wrote at the request of plaintiff's counsel. Dk. 52, p. 62.  This letter to counsel, dated June 26, 2003, shows that Dr. Spratt's conclusion of total disability was

based solely on plaintiff's statements to him. Dr. Spratt concludes:

> It is my continued belief that this patient is disabled on the basis of her pain. She is occasionally able to function for extended periods of time, i.e. up to an hour or two, but always requires prolonged rest after trying to perform any sort of exertion, traveling long distances or sitting up for any extended period of time.
>
> Although the objective measurements are evaluated by the functional capacity evaluation, her pain cannot be measured objectively. One must depend on the patient's evaluation of pain. Certainly the patient believes the pain is incapacitating when she tries to obtain the levels that are indicated in this report.
>
> In summary, I disagree totally with her being able to work at any exertional level due to her severe pain. It is also my opinion that the patient is truthful and straight forward about her symptoms. Finally it is my opinion that Ms. Niles remains totally disabled from performing any and all work activity on a part-time or full-time basis.

Dk. 52, Exh. 6, AMA 00519.

Dr. Spratt's opinion letter above shows that the only material reason he reached his conclusion was based on his complete acceptance of plaintiff's subjective complaints - an acceptance more or less required of treating physicians, but by no means required of this court. The conclusory statements by Dr. Spratt that plaintiff was totally disabled are not supported by any medical explanation for her pain.

For conditions such as a degenerative disc, conclusory statements by one's doctors that she is totally disabled are properly discounted when they are not supported by any medical explanation for her pain.

In such cases, "it [is] not unreasonable for the administrator [of

20

the benefits plan] to conclude that the only material reason the treating physicians were reaching their diagnoses was based on their acceptance of plaintiff's subjective complaints: an acceptance more or less required of treating physicians, but by no means required of the administrator." (Citations omitted.)The conclusory statements by Plaintiff's doctors that she was totally disabled may therefore be properly discounted, because they are not supported by any medical explanation for her pain. *See Jones v. Cont'l Cas. Co.*, 35 F.Supp.2d 1304, 1307-08 (D.Kan.1999), *aff'd,* 203 F.3d 835 (10th Cir. 2000) ("[I]n the absence of a correlation between [the doctor's] conclusory determination that [the plaintiff] was totally disabled and an explanation for this drastic diagnosis or an indication that he understood the nature of the occupation from which he concluded she was totally disabled, the court accords little weight to [the doctor's] assessment.").

*Flanagan v. Metropolitan Life Ins.*, 2006 WL 2571878, 4 (N.D.Okla. 2006), *affirmed*, 251 Fed. Appx. 484, 488-89 (10th Cir. 2007) ( finding "no appropriate clinical evidence to establish a disability" where the only testing referenced was an x-ray and MRI which allegedly showed mild disk degeneration but no bulging, neither of her physicians could account for her subjective complaints of pain, and one physician confirmed that there was no significant disk disease). In such cases, mere statements by physicians do not constitute objective evidence sufficient to show disability *Flanagan*, 251 Fed. Appx. 484, 488-89, *citing Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1099 (10th Cir.1999) (holding that a rational plan administrator could reject a doctor's report when there was no accompanying clinical data to support the conclusion.)

21

Plaintiff's claim of disability focuses on her chronic pain syndrome, which is not amenable to external testing, rather than her disk conditions. This court is permitted to consider subjective, as well as objective, evidence of a plaintiff's disability in ERISA cases. *Ray v. UNUM Life Ins. Co. of America*, 224 Fed.Appx. 772, 786-787, 2007 WL 915076, 13 (10th Cir. 2007). In some cases, the claimant's subjective, uncorroborated complaints of pain may constitute the only evidence of the ailment's severity. *Meraou v. Williams Co. Long Term Disability Plan,* 221 Fed.Appx. 696, 705-706, 2007 WL 431515, 8 (10th Cir. 2007) (fibromyalgia). *See Gibert v. Astrue*, 231 Fed. Appx. 778, 783-84 (10th Cir. 2007); *Brown v. Barnhart*, 182 Fed. Appx. 771 (10th Cir. 2006).

But even in the case of "subjective diseases," neither the plaintiff's own word nor her treating physician's word is conclusive. "In the case of a disease such as fibromyalgia, the claimant's subjective, uncorroborated complaints of pain constitute the only evidence of the ailment's severity. The medical inquiry is therefore intertwined with questions of the claimant's credibility." *Meraou*, 221 Fed.Appx. at 705. "With a condition such as fibromyalgia, where the applicant's physicians depend entirely on the patient's pain reports for their diagnoses, their ipse dixit cannot be unchallengeable." *Merauo*, citing *Jordan v. Northrop Grumman Corp.*

22

*Welfare Benefit Plan*, 370 F.3d 869, 878 (9th Cir. 2004). Here, where the court employs de novo review, the court will neither disregard plaintiff's subjective allegations of pain, nor find them controlling. Instead, the absence of an objective medical basis for the degree or severity of pain may affect the weight to be given to her subjective allegations of pain.

Plaintiff also believes that an IME of plaintiff in 1997 by Dr. Mary Brothers supports her claim for disability. The court disagrees. Dr. Brothers' physical examination of the plaintiff, her review of the objective tests, and her finding of error and inadequacy in Dr. Spratt's reports, led her to conclude that plaintiff would be able to work in an office setting. Dk. 52, Exh. 6, AMA 01010. In a lengthy letter dated Sept. 2, 1997, Dr. Brothers states plaintiff's view that she "finds it completely impossible to physically return to her usual job," and would have to consider applying for some type of long term disability," but adds "I must say, however, that her present physical findings are minimal enough that I think she will be found ineligible at this time by most of these programs" (TWA and the social security system). Dk. 52, Exh. 6, AMA 01011.

Dr. Brothers reviewed over a hundred pages of medical records, including an x-ray, multiple MRIs, an EMG (which was "completely normal"), and a neurology assessment ("completely normal"). Bone scan

23

reports showed "considerable cervical arthritis with foraminal narrowing at C5-6 and to a lesser extent at C6-7." AMA 01006; 01008. All other tests and examinations were unremarkable and basically normal, and she noted "really nothing in the records to substantiate a precise diagnosis of a significant lumbar disk." AMA 01005.

Dr. Brothers conducted a physical examination of plaintiff on August 19 and stated that her examination:

> did not reveal any significant physical findings that would prohibit her from doing many of her job duties. If she really does have considerable discomfort with recurring headaches on repetitive forward flexion of the head and neck, I still do not feel that she would be totally precluded from returning to work in an office setting. If she could obtain some kind of book stand on which to place documents so that she can look straight forward without flexing her chin repetitively in order to read, I think she could tolerate quite a bit of office duty.

AMA 01010. She noted "no significant description of a major herniated disk" at L5-S1, and "no current findings that would suggest a significant lumbar disk herniation. ... She does not appear to have a lumbar condition serious enough to warrant any major, aggressive care at the present time." Accordingly, surgery was "quite unlikely to occur." AMA 01010.

Regarding Dr. Spratt's records, Dr. Brothers believed they contained "a somewhat erroneous reference in the record here to the presence of two cervical disk herniations, which may be a typographical error." *Id.* Dr.

Brothers reviewed Dr. Spratt's opinion that plaintiff could do very little of anything, but noted "there is no functional capacity evaluation upon which to base these estimates, however. A request for medical leave was then denied because the attending physician's information was not felt to be adequate to justify the request, and an appointment was scheduled for this office for further assessment." AMA 01007. A fair reading of Dr. Brothers' opinion is that she found Dr. Spratt's opinion to be unsupported by objective tests, and that based upon her own examination of the plaintiff and her review of the medical records, she believed plaintiff could return to work in an office setting.

Plaintiff additionally cites certain records from the Mayo Clinic in support of her claim for disability. On September 30, 1997, an anesthesia electronic note by Dr. David Martin of Mayo's Pain Clinic states his impression/report/plan as: "#1. Chronic myofascial pain syndrome. A large portion of the patient's pain problems seem to be related to muscle and fascial pain exacerbated by stress and muscle tension. #2. greater occipital neuralgia, status post whiplash injury." AMA 868-69; AMA 00289. He referred plaintiff to the Pain Management Center, recommended doing a nerve block, and asked plaintiff to follow up in 4-6 weeks with a pain record. No such pain record has been located in the record.

Plaintiff additionally points to a note dated October 21,1998, by orthopedic surgeon Dr. Michael Yaszemski. He did a follow-up evaluation of plaintiff's diagnosis of facet arthritis at C2,C3, and found no need for surgery. He noted that the x-ray "demonstrates that there is no instability," that plaintiff stated that she "has been doing well" on her medication (Neurontin) but had an "increase in her pain since trying to taper herself out of it." He told plaintiff he felt she had "a clinically stable spine and that it is appropriate for her to pursue any activities she desires."  Pl. Exh. 6, AMA 00857. He indicated that plaintiff would "have to taylor her activities depending upon the amount of pain that she has while doing them" and that she was to follow up on an as needed basis. Plaintiff has not shown the court what, if any, follow up she did with Dr. Yaszemski or other physicians at the Mayo clinic, nor has she shown that she does not do well when using her pain medication as prescribed.

Dr. John Beaumier of the Mayo Clinic, on December 21, 1997, did an overall impairment assessment of plaintiff, and diagnosed plaintiff as having osteoarthritis of the cervical spine (C2-C3 facet arthritis), probably post-traumatic; chronic pain syndrome; and lumbar strain. His conclusions/recommendations state:

The arthritic type changes that she has are definite. How much

26

> this enters into the present problem is difficult to determine. I suspect that what she has is probably old in nature and was aggravated by the accident in November of 1996. I think the real issue here is chronic pain and this should be dealt with. She is making an effort to deal with this problem. Until the chronic pain issues are resolved, it would be very difficult for her to perform the duties of her previous job, inspecting airline vehicles. I believe the responsibility is greater than what she is capable of handling from her description today.

Dk. 52, Pl. Exh. 6, AMA 861-63. The following day Dr. Beaumier completed a TWA statement of physical limitations, which noted plaintiff's symptoms as "headaches" and "neck pain," and remarked: "The above limitations are redundant in this case until the issue of chronic pain is addressed - refer to my assessment of 12/21/97."  Dr. Beaumier does not opine about plaintiff's ability to engage in any occupation other than her previous job.

Dk. 52, Pl. Exh. 6, AMA 00971.

Plaintiff additionally shows the court an electronic note by Dr. Peter Wilson of the Mayo Clinic, dated October 22, 1998, stating: "Her pain and medication are causing significant disability." Pl. Exh. 6, # AMA 00866. He did not believe she could "perform the duties of her previous job" because of her reported "significant impairment of judgment" either from pain or gabapentin. He also indicates that plaintiff's IME "indicated that she is fit for work." *Id.* Dr. Wilson does not opine about plaintiff's ability to engage in any occupation other than her previous job, and plaintiff does not show that she

27

remained on gabapentin.

Dr. Wilson discussed but did not recommend active, non-surgical intervention to manage plaintiff's pain. He suggested she obtain counseling and that she resume taking Neurontin every six hours rather than every eight hours. Plaintiff agreed to try these suggestions. He concludes by stating "I also asked her to keep a pain record and return it in due course so that we can evaluate her response to the medication changes. She has agreed to keep me informed of her progress." *Id,* 00867. This is the most recent note in the record by any Mayo physician. Plaintiff does not show that she kept any pain record, that she informed Dr. Wilson of her progress, or that she gave him a pain record so he could evaluate her response to the medication changes.

The record cited by plaintiff does not show that plaintiff's doctors have consistently and uniformly stated that she has objective physical injuries which could explain her disabling pain, or that her pain would render her unable to engage in "any occupation."

Portions of the record not cited by plaintiff are to the same effect. Dr. Yaszemski was plaintiff's coordinating physician at the Mayo clinic. He recommended against surgery. The court notes that the second time plaintiff asked Dr. Yaszemski to fill out a disability form for her, he declined

28

to comment on her condition after July 1, 1997, noting that the issue should be resolved in the Impairment Evaluation Center. Pl. Exh. 6, # AMA 00277.

A psychological medical examination of plaintiff was conducted by Dr. Rosalyn Inniss, M.D. on October 6, 1997. Her diagnostic impression states:

> Adjustment Disorder with Anxiety. A significant level of depression is not evident. ... I do feel that no matter what is done, it will take 18 to 24 months before she is able to return to work full time. ... She could do light duty at a desk or in an office setting. I think, as previously stated, it will take 18 to 24 months before she returns to her former level of functioning.

Dk. 52, Pl. Exh. 6, # AMA 00998. This opinion does not support total disability, and instead opines that plaintiff could work in an office setting.

Dr Yaszemski referred plaintiff to Dr. Currier for a second opinion. On October 28, 1997, Dr Currier found that "her problem is all pain," that she was pleasant, that she has nearly full flexion and extension, could rotate to the right approximately 70 degrees and to the left 45 degrees, and had "no neurologic problem or instability." He stated that "the C2-3 facet is probably the source of a significant amount of her pain" but that she did not need surgery "especially since she is improving somewhat with the medication." Dk. 52, Pl. Exh. 6, # AMA 00276.

Dr. Yaszemski also referred plaintiff to Dr. Joyce Tinsley for an evaluation of her depression and pain management problem.  On October 29, 1997, Dr. Tinsley found plaintiff to be "mildly depressed, but her affect

is normal. There is no thought disorder." Dk. 52, Pl. Exh. 6, # AMA 00281.

Her impression/report/plan states:

> Chronic headache, neck pain. Adjustment disorder with depressed mood. Pain disorder. I believe the patient would be an excellent pain management candidate, and I believe she and her husband have some interest in pursuing this option at home.

Pl. Exh. 6, # AMA 00282.  Plaintiff has not shown the court that she

pursued the pain management course contemplated by Dr. Tinsley, nor

has she explained why it was not pursued, if not.

From July of 1997 to February of 1998, plaintiff saw psychotherapist

Brad Kahler, Ph.D, for "emotional backlash" from her accident. His

conclusion at the end of that therapy was:

> As a result of her participation in psychotherapy she did manage to come to terms with these issues and to see ways she could be productive even if the pain did not leave. She is a basically optimistic person who looks for the good in situations. Using these resources, I saw her overcome the depression and go on with her life.

Dk. 52, Pl. Exh. 6, # AMA 00264. No diagnosis of clinical depression was

made, and no lingering psychological issues remained.

Plaintiff did consistently visit Dr. Spratt, her family physician, and his

notes at times reflect her complaints of chronic pain and other times make

no such mention.  His note of May 28, 1997 states: "She feels that her

evaluation at Mayo Clinic was of some benefit. They put her on Neurontin

and on Daypro. They encouraged her to taper off of the Ultram. They did

some cervical steroid injections and referred her to the Pain Clinic at Saint

Luke's Hospital for further treatment thereof." AMA 00495. On October 21,

1999, Dr. Spratt noted her chronic neck pain, and numbness in plaintiff's

arms and discussed an EMG and nerve conduction study, but plaintiff

declined. "She will treat this conservatively for the time being and proceed

with that if it is starting to interfere with her life. She is having more neck

pain and upper back pain recently, and we discussed recurrent round of

physical therapy, which she agreed to." AMA 00454. Plaintiff does not

show the court that her physical therapy and treatment, if any, she received

at the Pain Clinic at Saint Luke's Hospital were unsuccessful. Nor does the

record reflect that an EMG or nerve conduction study was thereafter

conducted.

In a report dated October 17, 2003, an independent medical

consultant, Dr. Petrie, reviewed plaintiff's medical records and concluded:

(1) plaintiff had no demonstrated impairments related to the diagnosis of

either hypothyroidism or scarcoidosis; (2) there was no evidence that her

activities of daily living were restricted due to a psychological impairment;

(3) her degenerative disc disease was not established as the source of her

subjective complaints of pain, which were inconsistent with the objective

findings; (4) her subjective pain complaints were better explained by pending litigation and the possibility of financial gain than by significant physical findings; (5) mentally, she was overly focused on a non-existent fracture of her cervical spine, which was based on an early and incorrect diagnosis and unsupported by radiologic findings; and (6) she had the ability to perform light to moderate work activities. *Niles,* 2008 WL 711630, 3. This opinion obviously does not support total disability.

Plaintiff reports that her daily activities include light cooking, some shopping, pot gardening, and walking two miles a day. For fun she watches television, talks with friends and neighbors, and sometimes uses the computer e-mail. She states that her husband reads to her, showers her and washes her hair, and that she has a housekeeper who does the laundry. AMA 00917- 921. She has limitations in looking down and bending over, has "limited arm use" and drives "only when absolutely necessary." AMA 518-19; 00978, 00408.

In addition to the medical evidence and plaintiff's report of daily activities, the court considers the surveillance report and video. *See Johnson v. Liberty Life Assur. Co. of Boston*, 262 Fed.Appx. 865, 870-871, 2008 WL 268290, 5 (10th Cir.2008) (finding "there is nothing procedurally improper about the use of surveillance" in connection with the investigation

of a disability benefits claim.) The video shows a person exiting her vehicle,

opening the hood and trunk of the vehicle, crouching down to wash the

vehicle's tires, and bending at times to wash under the vehicle. Her

movements, including those of her arms, neck, and head, appear to be

fluid and without hesitation, and evidence no signs of pain or discomfort.

The court is aware that the video is only a snapshot which illustrates

plaintiff's physical abilities over a short period of time, and to that extent is

only weakly probative of her ability to work an eight-hour day. However, it

seems unlikely that plaintiff would choose to engage in the physical activity

of washing her car if doing so would produce subsequent incapacitating

pain or would require her to apply ice and rest for a prolonged period of

time. But the video does more than simply depict activities that are

arguably incompatible with plaintiff's claim of disability. When considered

together with plaintiff's reported limitations, the video calls into question

plaintiff's subjective reports of how disabling her pain is.

The functional capacity examination is also relevant to a showing of

disability. The  FCE grid shows that plaintiff's sitting tolerance and standing

tolerance are from 67-100% of an eight hour workday, as are her ability to

walk and climb stairs. Plaintiff did not report any dizziness, nausea, neck,

headache or other pain during any of those activities, as she did during

some other activities, such as lifting. AMA 00383. It also notes, regarding

plaintiff's coordination of her right and left upper extremities, her ability to

look down at objects on the table 34-66% of an eight-hour workday, noting

her right forearm pain, decreased concentration with time, and head and

neck discomfort. The recommendation for these complaints was that

plaintiff change her activities/postures as needed. AMA 00384. The

examiner credited plaintiff's complaints of discomfort, dizziness, and

nausea, and noted that she was cooperative and gave maximal effort on all

test items. AMA 00380. The FCE concluded that plaintiff was completely

able to perform at a light physical demand level for 8 hours a day, for a 5-

day workweek, and could perform work in a medium physical demand level

if certain specific functional restrictions listed (lifting, pushing, and carrying)

were observed. AMA 00385. Neither this examination, nor the labor market

survey, AMA 00605, assists plaintiff in her burden to show that she is

unable to work at any occupation, including a sedentary one.

No objective medical basis supports the degree of severity of

plaintiff's subjective complaints. Although plaintiff made some efforts to

obtain relief, she has not shown the court that she pursued others avenues

suggested by her physicians, and the efforts she did undertake are

markedly less extreme than those that would reinforce the credibility of her

subjective claim of disabling pain. *See Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (noting enhancement of credibility by pain-treatment procedures including not only heavy doses of strong drugs such as Vicodin, Toradol, Demerol, and morphine, but also the surgical implantation in her spine of a catheter and a spinal-cord stimulator...."). Plaintiff has not shown that she regularly uses assistive devices, or that she has a serious psychological disorder combined with a physical problem. Her daily activities include the ability to garden, to sit at a computer and to wash a car manually. Although the court has no doubt that plaintiff experiences some pain, plaintiff has failed to show by a preponderance of the evidence that she is totally disabled.

IT IS THEREFORE ORDERED that plaintiff's remanded claim for disability benefits is denied.

Dated this 1st  day of July, 2008.

s/ Sam A. Crow                                    
Sam A. Crow
U.S. District Senior Judge